[16 NE3d 1216, 992 NYS2d 738]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ROMAN BARET, Respondent.

Argued May 1, 2014; decided June 30, 2014

## POINTS OF COUNSEL

*Robert T. Johnson, District Attorney*, Bronx (*Clara H. Salzberg, Jason S. Whitehead* and *Joseph N. Ferdenzi* of counsel), for appellant. Under *Chaidez v United States* (568 US —, 133 S Ct 1103 [2013]), the Appellate Division's decision applying *Padilla v Kentucky* (559 US 356 [2010]) to defendant's 1996 conviction is wrong as a matter of law, and must therefore be reversed. (*People v Verdejo*, 109 AD3d 138; *People v Andrews*, 108 AD3d 727; *People v Bent*, 108 AD3d 882; *Policano v Herbert*, 7 NY3d 588; *People v Ford*, 86 NY2d 397; *People v McDonald*, 1 NY3d 109; *Teague v Lane*, 489 US 288.)

*Labe M. Richman*, New York City, for respondent. I. This Court should find that *Padilla v Kentucky* (559 US 356 [2010]) is retroactive as a matter of federal or state law, given the fundamental unfairness of categorically denying redress in New York for a plea obtained in violation of the United States Constitution between 1996 and 2009, where the defendant entered

the plea unaware that it carried the penalty of automatic deportation because the attorney's advice failed to comport with prevailing professional norms as determined by the United States Supreme Court and this failure affected the conviction result and constitutional representation could have saved the defendant from horrendous immigration consequences. (*Aguirre v Immigration & Naturalization Serv.*, 79 F3d 315; *Pascual v Holder*, 723 F3d 156; *INS v St. Cyr*, 533 US 289; *Ng Fung Ho v White*, 259 US 276; *People v Kuar*, 73 AD3d 1084; *People v De Jesus*, 34 Misc 3d 748; *People v Mercado*, 32 Misc 3d 1220[A], 2011 NY Slip Op 51373[U]; *People v Gooden*, 34 Misc 3d 1210[A], 2012 NY Slip Op 50029[U]; *People v Pepper*, 53 NY2d 213.) II. This Court should affirm the Appellate Division's reversal and remand for a hearing because the lower court, inter alia, mistakenly used a discretionary standard and, importantly, refused to apply *Padilla v Kentucky* (559 US 356 [2010]) because of a mistaken belief about its retroactive application and respondent had a strong claim because he was not told the clear and succinct immigration consequences of his conviction—that he was convicted of an aggravated felony under immigration law and that he would be deportable with no discretionary relief and could never travel and reenter the United States and would be forever barred from citizenship; and, it was obvious that defendant would never have taken the plea had he known this critical information because he categorically indicated that he wanted his plea back for other reasons soon after the guilty plea was entered and his entire family was here and there is a reasonable probability that he would have gone to trial or, at minimum, taken a plea with the same sentence or greater sentence on the last count of the indictment which was not an aggravated felony under immigration law requiring presumptively mandatory deportation. (*INS v St. Cyr*, 533 US 289; *Ng Fung Ho v White*, 259 US 276; *Pascual v Holder*, 723 F3d 156; *Aguirre v Immigration & Naturalization Serv.*, 79 F3d 315; *Strickland v Washington*, 466 US 668; *People v McDonald*, 1 NY3d 109; *United States v Couto*, 311 F3d 179; *United States v Vaval*, 404 F3d 144; *People v Stultz*, 2 NY3d 277.)

*Christopher N. Lasch*, Denver, Colorado, for Lenni Benson and others, amici curiae. I. Applying the *Teague* anti-redress rule to a claim of trial counsel ineffectiveness properly brought for the first time in state postconviction proceedings runs contrary to the principles underlying the federal redressability regime. (*Griffith v Kentucky*, 479 US 314; *Teague v Lane*, 489 US 288; *Danforth v Minnesota*, 552 US 264; *People v Eastman*,

85 NY2d 265; *Mackey v United States*, 401 US 667; *Desist v United States*, 394 US 244; *Padilla v Kentucky*, 559 US 356; *People v Cooks*, 67 NY2d 100; *People v Cuadrado*, 9 NY3d 362; *People v Stewart*, 16 NY3d 839.) II. New York can avoid the problems that have plagued the *Teague* rule. (*People v Favor*, 82 NY2d 254; *People v Eastman*, 85 NY2d 265; *Griffith v Kentucky*, 479 US 314; *Schriro v Summerlin*, 542 US 348; *Ring v Arizona*, 536 US 584; *Teague v Lane*, 489 US 288; *Mackey v United States*, 401 US 667; *United States v Mathur*, 685 F3d 396; *People v Harris*, 77 NY2d 434.) III. The *Padilla* rule is a "watershed" rule of constitutional criminal procedure. (*Mackey v United States*, 401 US 667; *Gideon v Wainwright*, 372 US 335; *Whorton v Bockting*, 549 US 406; *Beard v Banks*, 542 US 406; *Kitchens v Smith*, 401 US 847; *McConnell v Rhay*, 393 US 2.)

*Immigrant Defense Project*, New York City (*Manuel D. Vargas* and *Dawn M. Seibert* of counsel), *New York State Defenders Association*, Albany (*Jonathan E. Gradess* of counsel), *New York State Association of Criminal Defense Lawyers*, New York City (*Marc Fernich* and *Brendan White* of counsel), *National Association of Criminal Defense Lawyers*, Washington, D.C. (*Norman L. Reimer* of counsel), and *National Association of Criminal Defense Lawyers*, New York City (*Joel B. Rudin* of counsel), for New York State Defenders Association, Inc. and others, amici curiae. I. The advice regarding deportation is critical to an immigrant defendant. (*United States v Graham*, 169 F3d 787.) II. The professional standards supporting this duty in New York predate the 1996 immigration laws. (*People v Bennett*, 28 Misc 3d 575; *People v Burgos*, 37 Misc 3d 394; *INS v St. Cyr*, 533 US 289; *Padilla v Kentucky*, 559 US 356.) III. The rule articulated in *Padilla v Kentucky* (559 US 356 [2010]) applies under New York law to remedy *Padilla* violations pertaining to uninformed pleas entered in New York at least from the passage of the Antiterrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Immigrant Responsibility Act in 1996 onward. (*Danforth v Minnesota*, 552 US 264; *People v Favor*, 82 NY2d 254; *People v Eastman*, 85 NY2d 265; *People v Rajpaul*, 100 AD3d 1183; *People v Mitchell*, 80 NY2d 519; *Linkletter v Walker*, 381 US 618; *Hill v Lockhart*, 474 US 52; *People v Jackson*, 78 NY2d 638.)

## OPINION OF THE COURT

READ, J.

The United States Supreme Court held in *Padilla v Kentucky* (559 US 356 [2010]) that the Sixth Amendment requires crimi-

nal defense counsel to advise their noncitizen clients about the risk of deportation arising from a guilty plea. The Court subsequently held in *Chaidez v United States* (568 US —, 133 S Ct 1103 [2013]) that *Padilla* did not apply retroactively in federal collateral review. The issue in this appeal is whether, pursuant to federal or state retroactivity principles, *Padilla* nonetheless applies retroactively in state court postconviction proceedings. For the reasons that follow, we hold that it does not, and therefore reverse the Appellate Division.

## I.

On April 20, 1995, defendant Roman Baret was indicted on six counts of third-degree sale of a controlled substance (Penal Law § 220.39) and six counts of third-degree possession of a controlled substance (Penal Law § 220.16). He was also charged, while acting in concert with a codefendant, with an additional two counts of third-degree possession and one count of fourth-degree possession (Penal Law § 220.09). On December 23, 1996, defendant pleaded guilty to one count of third-degree sale in exchange for an indeterminate prison term of 2 to 6 years and a recommendation for shock incarceration. The plea fulfilled his part of a "no-split" offer under which his codefendant would plead guilty and receive probation.

During the plea colloquy, defendant admitted to the sale, acknowledged that a guilty plea was the equivalent of a conviction after trial and that, by pleading guilty, he was giving up his rights to remain silent, seek suppression of evidence and present his own evidence at trial. He acknowledged that he could receive between 8⅓ to 25 years in prison if convicted after trial. Defendant assured the judge that no one had forced him to plead guilty, and the judge warned that he was authorized to sentence defendant to the maximum term of incarceration if he failed to return for sentencing.

Defendant, represented by new counsel, subsequently moved to withdraw his plea; he claimed that he had pleaded guilty because of threats made by his codefendant. The judge denied the motion. Defendant then failed to appear for sentencing, and a bench warrant was issued. More than seven years later, on October 20, 2004, he was returned to court involuntarily. On December 20, 2004, the court (a new judge) sentenced defendant to the originally promised sentence of 2 to 6 years' incarceration.

On appeal, defendant argued that the judge who took the plea abused his discretion when he denied the motion to withdraw without holding a hearing. The Appellate Division disagreed and affirmed, with two Justices dissenting (43 AD3d 648 [1st Dept 2007]). A dissenting Justice granted defendant's application for leave to appeal to us (2007 NY Slip Op 83234[U] [2007]), and we affirmed (11 NY3d 31 [2008]).

In December 2010, defendant moved to vacate his conviction pursuant to CPL 440.10 on the ground that defense counsel was ineffective for failing to advise him of the immigration consequences of his guilty plea, entered 14 years earlier. He relied on the Supreme Court's then-recent decision in *Padilla*. Defendant claimed that he would have rejected the plea and gone to trial if he had known that, by pleading guilty, he became subject to deportation.

In a decision and order dated March 3, 2011, Supreme Court declined to apply *Padilla* retroactively to defendant's claim. The court next concluded that defendant had failed to show that his attorney was otherwise ineffective under *Strickland v Washington* (466 US 668 [1984]) in light of the generous plea bargain he received. Under the two-prong *Strickland* test, a defendant must show both that his attorney's conduct fell below established professional norms and that there is a reasonable probability that, but for the error, the proceeding would have turned out differently (*id.* at 687-688, 694).

On September 1, 2011, a Justice of the Appellate Division granted defendant's application for leave to appeal the denial of his CPL 440.10 motion (2011 NY Slip Op 82488[U] [2011]). The Appellate Division employed the framework described by the Supreme Court in *Teague v Lane* (489 US 288 [1989]) and adopted by us in *People v Eastman* (85 NY2d 265, 275-276 [1995]) to analyze whether *Padilla* should be applied retroactively (99 AD3d 408, 409 [1st Dept 2012]).

*Teague* established as a guiding principle that new rules of federal constitutional criminal procedure do not apply retroactively to cases that had become final on direct review before the new rule was announced (*see Whorton v Bockting*, 549 US 406, 416 [2007] ["Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally

applicable only to cases that are still on direct review"]).[1] Additionally, *Teague* created a test to differentiate a new rule from an existing or old rule; namely,

> "[i]n general, . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final" (489 US at 301 [citations omitted]).

Subsequent decisions defined *"dictated* by precedent" to mean that the result was "apparent to all reasonable jurists" at the time the defendant's conviction became final (*Lambrix v Singletary*, 520 US 518, 527-528 [1997]; *see also Graham v Collins*, 506 US 461, 477 [1993] [the "determinative question is whether reasonable jurists reading the case law that existed in 1984 could have concluded that (the defendant's) sentencing was *not* constitutionally infirm"]; *Butler v McKellar*, 494 US 407, 415 [1990] [a constitutional rule that is "susceptible to debate among reasonable minds" qualifies as a new rule]).

The *Teague* court also fashioned two exceptions to this general rule. First, "a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" (489 US at 311 [internal quotation marks omitted]). The second exception was "reserved for watershed rules of criminal procedure" (*id.*), defined generally as "those new procedures [of fundamental fairness] without which the likelihood of an accurate conviction is seriously diminished" (*id.* at 313).

As the Appellate Division acknowledged, we have long considered deportation to be a collateral consequence of a guilty

---

**1.** Although the lead opinion in *Teague* attracted only a four-Justice plurality, a majority of the Court soon adopted its retroactivity analysis (*see Penry v Lynaugh*, 492 US 302, 313 [1989] [adopting *Teague* analysis as majority approach], *overruled on other grounds by Atkins v Virginia*, 536 US 304 [2002]). Chief Justice Roberts has called *Teague* the Supreme Court's "leading modern precedent on retroactivity" (*Danforth v Minnesota*, 552 US 264, 292 [2008, Roberts, C.J., dissenting]). *Teague* descends from the approach to retroactivity advocated by Justice Harlan in *Desist v United States* (394 US 244, 256-269 [1969, Harlan, J., dissenting]) and *Mackey v United States* (401 US 667, 675-702 [1971, Harlan, J., concurring in judgments in part and dissenting in part]) (*see Teague*, 489 US at 303-313; *Danforth*, 552 US at 273-274, 297-300).

plea (*see* 99 AD3d at 409, citing *People v Ford*, 86 NY2d 397, 405 [1995]).[2] As a result, prior to *Padilla* we held in *Ford* that counsel's failure to warn a defendant that a guilty plea might lead to removal from the United States did not amount to ineffective assistance of counsel under the Federal or State Constitutions (*id.* at 405), while inaccurate advice about a guilty plea's immigration consequences constituted ineffective assistance under the Federal Constitution (*see People v McDonald*, 1 NY3d 109, 111 [2003]).[3] The Appellate Division nonetheless decided in favor of retroactivity on the theory that

> "*Padilla* did not establish a new rule under *Teague*; rather, it followed from the clearly established principles of the guarantee of effective assistance of counsel under *Strickland*, and merely clarified the law as it applied to the particular facts. Rather than overrule a clear past precedent, *Padilla* held that *Strickland* applies to advice concerning deportation, whether it be incorrect advice or no advice at all" (99 AD3d at 409 [internal quotation marks and citations omitted]).

Thus, the court held that *Padilla* was to be retroactively applied to pleas taken after Congress made "significant changes in immigration law" in 1996,[4] and "express[ed] no opinion on [its]

---

**2.** This is still the case (*see People v Peque*, 22 NY3d 168, 176, 192 and n 6, 204 [2013]). The Supreme Court, for its part, has "never attempted to delineate the world of 'collateral consequences' " (*Chaidez*, 568 US at — n 5, 133 S Ct at 1108 n 5, citing *Padilla*, 559 US at 364 and n 8; *see also id.* at 365-366 [commenting that whether the distinction between direct and collateral consequences is "appropriate" to "define the scope of constitutionally 'reasonable professional assistance' required under *Strickland* . . . is a question (the Court) need not consider . . . because of the unique nature of deportation," which was "uniquely difficult to classify as either a direct or collateral consequence" of a criminal conviction]).

**3.** The defendant in *McDonald* relied solely on federal constitutional law (1 NY3d at 114). In *Padilla*, the Supreme Court concluded "there [was] no relevant difference between an act of commission and an act of omission" with respect to counsel's duty to advise a defendant about the risk of deportation (*Padilla*, 559 US at 370 [internal quotation marks omitted]).

**4.** In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) (Pub L 104-132, 110 US Stat 1214 [enacted Apr. 24, 1996]), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Pub L 104-208, 110 US Stat 3009 [enacted Sept. 30, 1996; eff Apr. 1, 1997]). The *Padilla* Court referred to the changes to immigration law wrought by AEDPA and IIRIRA as "confirm[ing its] view that, as a

applicability . . . to pleas taken before" that year (*id.*). The court remanded for a hearing to determine "what advice, if any, counsel gave defendant regarding the immigration consequences of his plea, and, assuming the advice was constitutionally deficient, whether there is a reasonable probability that but for this deficiency, defendant would have gone to trial" (*id.* at 410).

The Appellate Division issued its decision and order on October 2, 2012. The Supreme Court handed down *Chaidez* on February 20, 2013. And on June 5, 2013, a Judge of this Court granted the People leave to appeal (21 NY3d 1002 [2013]).

## II.

### *Chaidez*

Roselva Chaidez entered the United States from Mexico in 1971 and became a lawful permanent resident in 1977. Chaidez was indicted on three counts of mail fraud because of her involvement in a staged automobile accident insurance scam. On advice of counsel, she pleaded guilty to two counts and was sentenced to four years of probation and ordered to pay restitution. Her conviction became final in 2004. Under federal immigration law, the crimes to which Chaidez pleaded are "aggravated felonies," and conviction of an aggravated felony is virtually certain to result in deportation (*see* 8 USC § 1227 [a] [2] [A] [iii]; *id.* § 1101 [a] [43] [M] [i] [an offense that involves fraud or deceit in which the loss to the victim exceeds $10,000 is an aggravated felony]). According to Chaidez, though, her attorney never advised her of this.

Chaidez later applied for naturalization, which brought her convictions to the attention of federal immigration authorities. They promptly initiated removal proceedings against her. She then sought a writ of coram nobis in federal district court to overturn her 2004 conviction, claiming ineffective assistance of counsel in connection with her decision to plead guilty. Chaidez maintained that she never would have pleaded guilty if her attorney had made her aware of the immigration consequences of such a plea. While the writ was pending, the Supreme Court handed down its decision in *Padilla*.

Applying *Teague*, the federal district court held that *Padilla* did not announce a new rule, but merely applied *Strickland* to

matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes" (*see Padilla*, 559 US at 364 [footnote omitted]).

new facts (*United States v Chaidez*, 730 F Supp 2d 896, 904 [ND Ill 2010]). After holding a hearing on Chaidez's coram nobis petition, the court determined that she was entitled to relief for ineffective assistance pursuant to *Strickland*, granted the petition and vacated her conviction (2010 WL 3979664, 2010 US Dist LEXIS 107877 [ND Ill, Oct. 6, 2010, No. 03 CR 636-6]). On appeal, the United States Court of Appeals for the Seventh Circuit reversed, concluding that *Padilla* had announced a new rule within the meaning of *Teague* (*Chaidez v United States*, 655 F3d 684, 686 [2011]).[5] The Supreme Court agreed and therefore affirmed, holding that, under the *Teague* framework, *Padilla* does not apply in collateral challenges to final convictions.

Writing for a six-Justice majority,[6] Justice Kagan stated as a basic premise that " 'a rule designed for the specific purpose of evaluating a myriad of factual contexts . . . will . . . infrequent[ly] . . . yield[ ] a result so novel that it forges a new rule . . . not dictated by precedent' " within the meaning of *Teague* (*Chaidez*, 568 US at —, 133 S Ct at 1107, quoting *Wright v West*, 505 US 277, 309 [1992, Kennedy, J., concurring in judgment]). As a result, "garden-variety applications" of the *Strickland* test "do not produce new rules" (568 US at —, 133 S Ct at 1107). But, she continued, *Padilla* did not "merely [make] clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent" (*id.* at 1108). Rather, she explained,

> "*Padilla* did something more. Before deciding if failing to provide such advice fell below an objective standard of reasonableness, *Padilla* considered a

---

**5.** The parties in *Chaidez* agreed that neither of the two *Teague* exceptions to non-retroactivity applied (*see Chaidez*, 655 F3d at 688). Accordingly, Chaidez did not argue in the Supreme Court that the *Teague* watershed exception was relevant (*see Chaidez*, 568 US at — n 3, 133 S Ct at 1107 n 3).

**6.** Justice Thomas, who dissented in *Padilla*, still considered that case to be "wrongly decided" and so, in his view, the majority's *Teague* analysis was "unnecessary" (568 US at —, 133 S Ct at 1114 [Thomas, J., concurring in judgment only]). Justice Sotomayor dissented in a writing joined by Justice Ginsburg. As Justice Sotomayor summarized her analysis,

> "*Padilla* did nothing more than apply the existing rule of *[Strickland]* in a new setting, the same way the Court has done repeatedly in the past: by surveying the relevant professional norms and concluding that they unequivocally required attorneys to provide advice about the immigration consequences of a guilty plea" (*id.* [Sotomayor, J., dissenting]).

threshold question: Was advice about deportation categorically removed from the scope of the Sixth Amendment right to counsel because it involved only a collateral consequence of a conviction, rather than a component of the criminal sentence? In other words, prior to asking *how* the *Strickland* test applied ('Did this attorney act unreasonably?'), *Padilla* asked *whether* the *Strickland* test applied ('Should we even evaluate if this attorney acted unreasonably?'). And [because] . . . that preliminary question about *Strickland*'s ambit came to the *Padilla* Court unsettled[,] . . . the Court's answer ('Yes, *Strickland* governs here') required a new rule" (*id.* [internal quotation marks and citation omitted]).

Justice Kagan then considered as "relevant background" the Court's decision in *Hill v Lockhart* (474 US 52 [1985]), which "explicitly left open whether advice concerning a collateral consequence must satisfy Sixth Amendment requirements" (568 US at —, 133 S Ct at 1108). As a result, she observed, resolution of this issue fell to the lower federal and state courts, and all 10 of the federal appellate courts to consider the issue and 30 of the 32 state appellate courts (and here, Justice Kagan cited our decision in *Ford*) decided that "the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation" (*id.* at 1109). This "imbalance," she remarked, even caused the authors of "the principal scholarly article on the subject to call the exclusion of advice about collateral consequences from the Sixth Amendment's scope one of 'the most widely recognized rules of American law' " (*id.*, quoting Chin & Holmes, *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L Rev 697, 706 [2002]).

In sum, Justice Kagan concluded, the lower federal and state appellate courts "almost uniformly insisted on what *Padilla* called the 'categorica[l] remov[al]' of advice about a conviction's non-criminal consequences—including deportation—from the Sixth Amendment's scope"; *Padilla* was the first case to "reject[ ] that categorical approach—and so [make] the *Strickland* test operative—when a criminal lawyer gives (or fails to give) advice about immigration consequences"; therefore, *Padilla* announced a new rule within the meaning of *Teague* (568 US at —, 133 S Ct at 1110-1111). Indeed, she added, "[i]f that

does not count as 'break[ing] new ground' or 'impos[ing] a new obligation,' we are hard pressed to know what would" (*id.* at —, at 1110, quoting *Teague*, 489 US at 301). Accordingly, the Court affirmed the Seventh Circuit, holding that *Padilla* constituted a new rule and, as such, would not apply in collateral challenges in federal courts to final convictions.[7]

## III.

Defendant does not regard *Chaidez* as creating an insuperable obstacle to an affirmance. He asks us to hold that *Padilla* applies in collateral challenges to convictions in New York courts occurring between 1996, when Congress "severely tightened" immigration laws, and March 31, 2010, when *Padilla* was handed down, and offers three theories or arguments to support his request: (1) *Padilla* is a watershed rule of federal constitutional criminal procedure within the meaning of *Teague* and/or *Eastman*; or, in light of *Danforth* we should either (2) interpret *Teague* more broadly than did the Supreme Court in *Chaidez* and hold that *Padilla* is simply an application of *Strickland*, or (3) apply the three-factor test in *People v Pepper* (53 NY2d 213 [1981], *cert denied sub nom. New York v Utter*, 454 US 1162 [1982]) to make *Padilla* retroactive on collateral review. Having already discussed *Padilla*, *Strickland*, *Teague* and *Chaidez* in relevant detail, we now turn to *Danforth*, *Pepper* and *Eastman*.

### *Danforth*

In 1996, a Minnesota jury convicted Danforth of a sex offense involving a six-year-old boy. The victim was ruled incompetent to testify at trial, but the jury saw and heard a videotaped

---

**7.** After *Chaidez* was decided, the Appellate Division abandoned the reasoning that it had espoused in this case on the ground that " 'the principles of retroactivity developed by the Supreme Court in construing Federal constitutional law govern the disposition' " of a New York case involving a new rule of federal constitutional criminal procedure (*People v Verdejo*, 109 AD3d 138, 141 [1st Dept 2013], quoting *Eastman*, 85 NY2d at 274-275), and the *Padilla* rule, which "merely prescrib[es] a duty imposed on counsel," does not fall within *Teague*'s exception to non-retroactivity for watershed rules (109 AD3d at 141; *see also People v Bent*, 108 AD3d 882, 883 [3d Dept 2013] ["Notwithstanding our prior holding that (*Padilla*) applies retroactively, the United States Supreme Court has declared that *Padilla* is a 'new rule,' which is not retroactive"; therefore, defendant's CPL 440.10 motion to vacate his judgment of conviction, which was final prior to *Padilla*, was properly denied] [citation omitted]; *People v Andrews*, 108 AD3d 727 [2d Dept 2013] [declining to give broader retroactive effect to *Padilla* than required under *Teague*]; *People v Soodoo*, 109 AD3d 1014 [2d Dept 2013] [same]; *People v Alvarez*, 111 AD3d 843 [2d Dept 2013] [same]).

interview of him. Danforth unsuccessfully urged on appeal that the tape's admission violated his right to confrontation secured by the Sixth Amendment. His conviction became final in 1998. After the Supreme Court handed down its decision in *Crawford v Washington* (541 US 36 [2004]), though, Danforth filed a state postconviction petition. He argued that he was entitled to a new trial because the admission of the taped interview violated the rule announced in *Crawford* (i.e., that defendants have a right under the Sixth Amendment's Confrontation Clause to cross-examine testimonial witnesses). Assessing Danforth's claim in light of *Teague*, the postconviction and intermediate appeals courts both ruled that *Crawford* did not apply retroactively.

On appeal to the Minnesota Supreme Court, Danforth for the first time argued that Minnesota courts were free to apply retroactivity more broadly than *Teague*, and that he was entitled to the benefit of *Crawford* under *state* retroactivity principles. He took the position that *Teague* "dictate[d] the limits of retroactive application of new rules only in *federal* habeas corpus proceedings and [did] not limit the retroactive application of new rules in *state* postconviction proceedings" (*Danforth v State*, 718 NW2d 451, 456 [Minn 2006]). The court chose to address this issue in the interests of justice, but rejected Danforth's assertions that "state courts are free to give a Supreme Court decision of federal constitutional criminal procedure broader retroactive application than that given by the Supreme Court" (*id.*). Applying *Teague*, the court then concluded that *Crawford* was a new rule which did not fall within the exception for watershed rules and therefore did not apply retroactively.

In explaining the decision to grant certiorari in *Danforth*, the Supreme Court noted that although the Minnesota Supreme Court "correctly concluded that federal law does not *require* state courts to apply the holding in *Crawford* to cases that were final when that case was decided" (*Danforth*, 552 US at 268-269 [discussing its holding in *Whorton* (549 US at 409), that *Crawford* is not a watershed rule]), a question remained about whether *Teague* "prohibit[ed] [state courts] from doing so" (*Danforth*, 552 US at 268-269). The Court held that *Teague* did not.[8]

In so deciding, the Court first summarized the *Teague* rule as follows:

---

**8.** The *Danforth* Court expressed no opinion, however, as to whether states are required to retroactively apply any new rules that the federal courts may determine to be watershed rules (*see Danforth*, 552 US at 269 n 4).

"New constitutional rules announced by this Court that place certain kinds of primary individual conduct beyond the power of the States to proscribe, as well as 'watershed' rules of criminal procedure, must be applied in all future trials, all cases pending on direct review, and all federal habeas corpus proceedings. All other new rules of criminal procedure must be applied in future trials and in cases pending on direct review, but *may not provide the basis for a federal collateral attack on a state-court conviction*" (*id.* at 266 [emphasis added]).

Consistent with this formulation, *Danforth*'s holding derived generally from the notion that *Teague* was "an exercise of [the] Court's power to interpret the federal habeas statute" (*id.* at 278); "was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions"; and was "justified . . . in part by reference to comity and respect for the finality of state convictions[,] . . . considerations . . . unique to *federal* habeas review of state convictions" (*id.* at 279).[9] As a consequence, the Court concluded,

"[i]t is thus abundantly clear that the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions" (*id.* at 280-281).[10]

On remand, the Minnesota Supreme Court elected to retain the *Teague* standard, principally so as not to " 'undermine[ ]

---

**9.** Of course, whether or not the *Teague* framework was originally shaped by considerations peculiar to federal habeas review of state court convictions, in *Chaidez* the Supreme Court applied *Teague* in a proceeding where federal coram nobis relief was sought (*see Chaidez*, 568 US at — n 1, 133 S Ct at 1106 n 1; *see also Danforth*, 552 US at 269 n 4 [expressing no opinion as to whether *Teague* governs cases brought under 28 USC § 2255 to attack federal criminal sentences]; *id.* at 281 n 16 [noting that lower federal courts have applied *Teague* to motions brought pursuant to 28 USC § 2255]).

**10.** In his dissenting opinion, which Justice Kennedy joined, Chief Justice Roberts took the position that "the retroactivity of new federal rules is a question of federal law binding on States" (552 US at 293). He therefore concluded that because Danforth's conviction became final before the *Crawford* decision and the Court held in *Whorton* that *Crawford* did not apply in collateral review, "[t]hat should be the end of the matter" (*id.* at 311).

the principle of finality which is essential to the operation of our criminal justice system' " (*Danforth v State*, 761 NW2d 493, 498 [Minn 2009], quoting *Teague*, 489 US at 309), and affirmed Danforth's conviction. The court indicated, however, that it would not necessarily be bound in the future by the Supreme Court's determination as to whether a new rule was "critical to fundamental fairness" (*id.* at 500).

### Pepper

In *People v Samuels* (49 NY2d 218 [1980]), we held that once an accusatory instrument has been filed, a defendant cannot waive his constitutional right to counsel in counsel's absence. The issue for us in *Pepper* was the "retrospective effect, if any, . . . to be accorded" *Samuels* in three appeals (*Pepper*, 53 NY2d at 217). In two of them (*Pepper* and *People v Utter*), *Samuels* was decided while the defendants' appeals were pending in the Appellate Division. That court reversed the judgments of conviction and sentences and remanded the cases for further proceedings because incriminating statements had been elicited in violation of *Samuels*. In the third case (*People v Torres*), *Samuels* was handed down about a year and a half after a Judge of this Court denied the defendant's application for leave to appeal, which was subsequently granted upon the defendant's motion for reconsideration.

Seeking a balance between "full retroactive application (permitting a collateral attack on a conviction no longer in normal appellate channels)" and "limit[ing] relief to prospective police conduct or trials" (53 NY2d at 220), the *Pepper* court adopted the three-part test set out by the Supreme Court in *Linkletter v Walker* (381 US 618, 629 [1965]) and recapitulated in *Stovall v Denno* (388 US 293, 297 [1967]) and *Desist* (394 US at 249).[11] The *Pepper* test requires us to

---

**11.** As Chief Justice Roberts pointed out in his dissent in *Danforth*, the Supreme Court walked away from *Linkletter* in two stages. First, in *Griffith v Kentucky* (479 US 314 [1987]), decided more than five years after we handed down *Pepper*, the Court adopted Justice Harlan's views, as expressed in his separate writings in *Desist* and *Mackey*, with regard to the retroactivity of a new rule in cases still on direct appeal. Thus, the Court in *Griffith* "held that 'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, *state or federal*, pending on direct review or not yet final' " (*Danforth*, 552 US at 297, quoting *Griffith* at 328). Then in *Teague*, the Court "completed the project of conforming [its] view on the retroactivity

"weigh three factors to determine whether a new
precedent operates retroactively: the purpose to be
served by the new standard; the extent of the reli-
ance by law enforcement authorities on the old stan-
dard; and the effect on the administration of justice
of a retroactive application of the new standard.
The second and third factors are, however, only
given substantial weight 'when the answer to the
retroactivity question is not to be found in the
purpose of the new rule itself. Thus, where otherwise
there could be a complete miscarriage of justice,
current constitutional standards that go to the heart
of a reliable determination of guilt or innocence
have been substituted for those in effect at the time
of trial' " (*Policano v Herbert*, 7 NY3d 588, 603
[2006] [citation omitted], quoting *Pepper*, 53 NY2d
at 220-221).

Observing that we had previously considered "a defendant's
right to counsel in pretrial encounters [to] fall[ ] within a middle
ground" such that retroactivity had previously "been limited to
those [cases] still on direct review at the time the change in law
occurred," we saw "no reason to depart from that course" (*Pep-
per*, 53 NY2d at 221).

In weighing the three factors, we commented that "uncoun-
seled station house interrogations [do not] necessarily go to the
ultimate issue of guilt or innocence, [but] they are not insignifi-
cant events"; that "the relatively early terminal point of
retroactivity limited to cases young enough to still be on direct
appeal militates against the likelihood of prejudicial mildewing
of witnesses' memories"; and that the People could not credibly
plead reliance since the holding in *Samuels* "had been more
than foreshadowed" by earlier rulings (*id.* at 221-222).

Thus, we concluded that the Appellate Division had properly
applied *Samuels* in Pepper's and Utter's appeals. Torres,
however, was not entitled to benefit from *Samuels* because

"[t]he normal appellate process came to an end for
him upon the original unconditional denial of his
application for leave to appeal to this court. There-
after, only complete retroactivity could make *Sam-
uels* applicable. And that, impermissibly, would

of new rules of criminal procedure to those of Justice Harlan" (*Danforth*, 552
US at 299; *see also* n 1, *supra*).

mean that every defendant to whose case it was relevant, no matter how remote in time and merit, would become its beneficiary. Absent manifest injustice, no exception was available to Torres" (*id.* at 222 [citation and internal quotation marks omitted]).

### Eastman

The defendant in *Eastman* moved pursuant to CPL 440.10 to vacate his judgment of conviction and sentence for murder and a weapon offense on the ground that he had been convicted in violation of federal constitutional law, as announced in the Supreme Court's then-recent decision in *Cruz v New York* (481 US 186 [1987]).[12] The nontestifying codefendant's redacted confession had been introduced into evidence against Eastman at trial. He argued that *Cruz* should be applied retroactively in his case. Supreme Court denied the motion, and the Appellate Division affirmed on the basis of harmless error.

We began our analysis with the observations that "the Supreme Court's holding in *Cruz* marks a break from both Federal and State law precedents," and "[b]ecause *Cruz* fundamentally alters the Federal constitutional landscape, *the principles of retroactivity developed by the Supreme Court in construing Federal constitutional law govern the disposition of this case*" (*Eastman*, 85 NY2d at 274-275 [emphasis added]). We then proceeded to evaluate Eastman's motion in light of *Teague*.

We concluded first that *Cruz* stated a new rule within the meaning of *Teague* as it "unquestionably departs from established precedent, and implicates a bedrock procedural element— the Sixth Amendment right of confrontation" (*id.* at 276). We then looked at whether *Cruz* fell within *Teague*'s exception to non-retroactivity for a watershed rule, and concluded that it did. We reasoned that

> "[a]s the rule announced in *Cruz* is central to an accurate determination of guilt or innocence, the Supreme Court determined that the admission of

---

**12.** Reversing our decision in *People v Cruz* (66 NY2d 61 [1985]), the Supreme Court held in *Cruz v New York* that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, . . . the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him" (*Cruz*, 481 US at 193).

the codefendant's inculpatory confession against the defendant undermined the fundamental fairness of the trial, where, as here, there was no opportunity for cross-examination to test the reliability of the codefendant's confession. Therefore, we conclude that retroactive application of *Cruz* is constitutionally commanded on collateral review of a conviction" (*id.* [citation omitted]).

Deciding further that the *Cruz* error was not harmless beyond a reasonable doubt, we reversed the Appellate Division, granted Eastman's CPL 440.10 motion, vacated his convictions and ordered a new trial.

## IV.

### Is *Padilla* a Watershed Rule of Federal Constitutional Criminal Procedure within the Meaning of *Teague* and/or *Eastman*?

Defendant emphasizes that Chaidez argued solely that *Padilla* was not a new rule; she did not contend, alternatively, that even if the Supreme Court disagreed (as it did), *Padilla* would qualify for the watershed exception to the non-retroactivity of new rules. Chaidez's neglect to pursue this tack is not surprising, as the Supreme Court has analogized a watershed rule of federal constitutional criminal procedure to the right to counsel established by *Gideon v Wainwright* (372 US 335 [1963]; *see Teague*, 489 US at 311-312; *see also Whorton*, 549 US at 419 ["we have repeatedly referred (to *Gideon*) in discussing the meaning of the *Teague* exception" for watershed rules]). In short, "[t]hat a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is *seriously* diminished' " (*Schriro v Summerlin*, 542 US 348, 352 [2004], quoting *Teague*, 489 US at 313).

As the Supreme Court has more recently recapitulated these requirements: "First, the rule must be necessary to prevent an impermissibly large risk of an inaccurate conviction. Second, the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding" (*Whorton*, 549 US at 418 [internal quotation marks and citations omitted]). The Court has made clear that, for purposes of this second requirement, it is insufficient that a new rule of federal constitutional criminal procedure is "*based on* a 'bedrock' right" (*id.* at 420-421). "Instead, . . . a new rule must itself constitute

a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding"; further, in evaluating whether this requirement has been fulfilled, the Court "again . . . looked to the example of *Gideon*, and . . . [has] not hesitated to hold that less sweeping and fundamental rules do not qualify" (*id.* at 421 [internal quotation marks and citation omitted]).

Finally, in *Teague*, and repeatedly since, the Supreme Court has emphasized that additional procedural rules of such profound importance are "unlikely . . . to emerge" (*Teague*, 489 US at 313; *accord Graham v Collins*, 506 US 461, 478 [1993]; *Sawyer v Smith*, 497 US 227, 243 [1990]; *Butler*, 494 US at 416; *Tyler v Cain*, 533 US 656, 666 n 7 [2001]; *Schriro*, 542 US at 352). And no watershed rule has, in fact, ever materialized (*see United States v Mandanici*, 205 F3d 519, 529 [2d Cir 2000] [noting that "(b)eginning with the rule at issue in *Teague*, the Court has measured at least eleven new rules, or proposed new rules, of criminal procedure against the criteria for the (watershed) exception and, in every case, has refused to apply the rule at issue retroactively"]; *see also Schriro* 542 US 348 [2004], *supra* [rejecting retroactivity for *Ring v Arizona* (536 US 584 [2002])]; *Beard v Banks*, 542 US 406, 417-420 [2004] [rejecting retroactivity for *Mills v Maryland* (486 US 367 [1988])]; *Whorton*, 549 US at 419 [rejecting retroactivity for *Crawford*]).

Defendant argues that *Padilla* fulfills both requirements as a matter of federal and state law. As to the first requirement, he focuses on the notion that noncitizen defendants, particularly those charged with drug offenses, were often "lured into . . . extremely lenient dispositions without knowing the truth—that their convictions will lead to deportation with no remedy, lifetime bars to a green card or citizenship," and often, with a bit of foresight, their pleas might have been recast to avoid untoward immigration consequences. That a plea bargain may turn out to be far less advantageous than a defendant anticipated, however, does not pose "an impermissibly large risk of an *inaccurate* conviction" (*Whorton*, 549 US at 418 [emphasis added]).

As for the second requirement, defendant urges that *Padilla* does, in fact, constitute a bedrock principle akin to *Gideon* because in the latter, "the defendant was given the right to free counsel and now in *Padilla*, defendants are given the right to free immigration counsel on their criminal case." But *Padilla*

does no such thing. The *Padilla* Court recognized that immigration law was "complex" and often "unclear or uncertain," and that "[s]ome members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it" (*Padilla*, 559 US at 369). As a result, *Padilla* imposes a relatively modest duty on counsel; specifically,

> "[w]hen the law is not succinct and straightforward . . . a criminal defense attorney *need do no more* than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is *truly clear*, . . . the duty to give correct advice is equally clear" (*id.* [emphases added and footnote omitted]).

This is a far cry from "the right to free immigration counsel." And even if *Padilla* did, in fact, give defendants such a right, immigration advice is not critical to an accurate determination of guilt or innocence.

Finally, defendant argues that *Eastman* only calls for a new rule to "implicate[ ] a bedrock procedural element," such as, in that case, the Sixth Amendment right to confrontation (*Eastman*, 85 NY2d at 276). At the time we adopted the *Teague* framework in *Eastman*, we clearly assumed—just like the Minnesota Supreme Court—that we were obligated to determine the retroactivity of federal constitutional criminal procedures according to federal, rather than state, law. We said as much (i.e., "the principles of retroactivity developed by the Supreme Court in construing Federal constitutional law govern the disposition of this case") (*id.* at 275). If we had thought otherwise, we would have decided the retroactivity issue in *Eastman* using our already well-established three-part *Pepper* test. And if we *had* nonetheless intended to interpret *Teague* more broadly than the Supreme Court, we presumably would have said so rather than merely depend on the word "implicate" to convey this idea. Additionally, unlike the situation here, the Supreme Court had not already decided (and, in fact, never decided) whether the particular procedural rule at issue in *Eastman* (i.e., *Cruz*) applied retroactively in collateral proceedings. Finally, the very narrow way in which the Supreme Court has interpreted the watershed exception is much clearer from the vantage point of 2014 than it would have been when we decided *Eastman* in 1995, only six years after *Teague*.

Taking all these considerations into account, we have no doubt that the Supreme Court—if the issue had ever reached

it—would have disagreed with our assessment that, pursuant to *Teague*, *Cruz* was a watershed rule. After all, the Court has decided that *Crawford*, a considerably more far-reaching expansion of the Sixth Amendment right to confrontation, is not a watershed rule. Equally, given the Supreme Court's now extensive precedent, we are confident that *Padilla* does not qualify for *Teague*'s watershed exception. We understand that *Danforth* frees us to interpret *Teague* more broadly than the Supreme Court when addressing retroactivity in the context of state collateral review. The reasons proffered by defendant, however, certainly do not convince us that we should do so in this case. In particular, if every federal constitutional criminal procedure based on a bedrock principle of federal constitutional criminal law is a watershed rule, then the exception will swallow the rule and any semblance of finality will vanish. Moreover, we cannot say, as we did about *Cruz*, that *Padilla* is "central to an accurate determination of guilt or innocence," and safeguards "the fundamental fairness of [a] trial" (*Eastman*, 85 NY2d at 276).

### Should we Interpret *Teague* More Broadly than Did the Supreme Court in *Chaidez* and Hold That *Padilla* is Simply an Application of *Strickland*?

Defendant encourages us to adopt the reasoning of the two-Justice dissent in *Chaidez*.[13] We consider the majority's logic to

---

**13.** Defendant points out that the Supreme Judicial Court of Massachusetts concluded post-*Chaidez* that "as a matter of Massachusetts law and consistent with [its] authority as provided in *[Danforth]*, . . . the Sixth Amendment right enunciated in *Padilla* was not a 'new' rule and, consequently, defendants whose State law convictions were final after April 1, 1997, may attack their convictions collaterally on *Padilla* grounds" (*Commonwealth v Sylvain*, 466 Mass 422, 423-424, 995 NE2d 760, 762 [2013]). There exist two key differences between Massachusetts and New York. First, although the lower courts in Massachusetts seem to have long held that a defendant need not be informed of the collateral consequences of a plea, including the risk of deportation (*see Commonwealth v Fraire*, 55 Mass App 916, 917, 774 NE2d 677, 678 [2002] [cited in *Chaidez*, 568 US at — n 8, 133 S Ct at 1109 n 8]), the Supreme Judicial Court never adopted and endorsed this position, as we did in *Ford*. Second, prior to *Chaidez* the Supreme Judicial Court held in *Commonwealth v Clarke* (460 Mass 30, 44, 949 NE2d 892, 903-904 [2011]) that *Padilla* was not a new rule within the meaning of *Teague* and therefore applied retroactively to cases on collateral review. *Sylvain* simply affirmed the court's previous decision in *Clarke*.

Defendant has also brought to our attention the recent decision of the New Mexico Supreme Court in *Ramirez v State* (333 P3d 240 [NM, June 19, 2014]),

be far more compelling, though. The majority determined that *Padilla* was a new rule and not just an application of the two-prong *Strickland* test for ineffective assistance of counsel to a new set of facts. In so doing, Justice Kagan emphasized that the lower federal and state courts had almost uniformly excluded advice about the immigration consequences of a guilty plea from the scope of the Sixth Amendment right to effective assistance of counsel.

■ This was certainly true in New York. In 1995 we held in *Ford* that defense counsel were not "under a duty to warn defendants of the possible deportation consequences before entering a guilty plea"; and, stated another way, that "the failure of counsel to warn defendant of the possibility of deportation [did not] constitute ineffective assistance of counsel" (*Ford*, 86 NY2d at 401, 404). Thus, *Padilla* flatly contradicted and supplanted *Ford*'s holding as to whether defense attorneys were obligated to advise their noncitizen clients about the immigration consequences of a guilty plea. We agree with Justice Kagan that "[i]f [this] does not count as 'break[ing] new ground' or 'impos[ing] a new obligation,' we are hard pressed to know what would" (*Chaidez*, 568 US at —, 133 S Ct at 1110, quoting *Teague*, 489 US at 301). Thus, *Padilla* created a new rule of federal constitutional criminal procedure in New York which, consistent with *Teague* and *Eastman*, does not apply retroactively in CPL 440.10 proceedings.

### Does the Three-Part Test in *Pepper* Make *Padilla* Retroactive on Collateral Review?

■ The *Pepper* factors disfavor retroactivity, too. Under the first and most important factor, "current constitutional standards that go to the heart of a reliable determination of guilt or innocence" will be applied retroactively, but "decisions which

which declined to follow *Chaidez*. But as Justice Kagan pointed out, New Mexico is one of only two states whose highest court had held, prior to *Padilla*, that "an attorney could violate the Sixth Amendment by failing to inform a client about deportation risks or other collateral consequences of a guilty plea" (*Chaidez*, 568 US at — and n 9, 133 S Ct at 1109 and n 9, citing *State v Paredez*, 2004-NMSC-036, ¶¶ 17-19, 136 NM 533, 539, 101 P3d 799, 805 [2004]). The *Ramirez* court applied its *Paredez* precedent retroactively to 1990, when New Mexico amended a certain form on which the judge was required to indicate that he had informed the defendant, among other things, that a conviction might affect his immigration status, and the defendant and defense counsel, in turn, were required to certify that the defendant had been so advised.

are only collateral to or relatively far removed from the fact-finding process at trial" apply prospectively only (*Pepper*, 53 NY2d at 221). *Padilla* has nothing to do with a reliable determination of guilt or innocence; rather, *Padilla* assures that noncitizen defendants appreciate the immigration risks that inhere in guilty pleas to crimes they acknowledge during the plea allocution to having committed.

As to the remaining two *Pepper* factors—i.e., reliance on the old standard and the effect of retroactivity on the administration of justice—here again our decision in *Ford* looms large. As one defense attorney put it in an affirmation in support of a CPL 440.10 application, he knew that his client was a Mexican national, but "it was [his] practice not to dispense any advice regarding the immigration consequences of entering into a negotiated plea because prevailing Court of Appeals precedent did not require it" (*Verdejo*, 109 AD3d at 140). Many defense attorneys no doubt warned their noncitizen clients about the immigration consequences of a guilty plea. But in light of *Ford* (and *McDonald*), many others were likely reluctant to volunteer advice in an often complex area of law outside their legal specialty. And those who did would have had no reason to create or maintain records to memorialize conversations with their clients on this topic. Courts would have to make factual findings based on off-the-record conversations years after a plea, based on faded memories. Here, for example, defendant entered into the plea he now seeks to challenge in December 1996, nearly two decades ago. Such considerations, coupled with the sheer volume of prosecutions disposed of by guilty plea (*see Missouri v Frye*, 566 US —, —, 132 S Ct 1399, 1407 [2012] ["'(N)inety-four percent of state convictions are the result of guilty pleas"]), weigh heavily against retroactive application of *Padilla*.

Accordingly, the Appellate Division's order should be reversed and the Supreme Court order reinstated.

Chief Judge LIPPMAN (dissenting). A guilty plea by a noncitizen defendant is not knowing and voluntary where the defendant entered the plea unaware that it carried a substantial risk of deportation. This is the case regardless of whether the defendant entered the plea before or after the Supreme Court decided *Padilla v Kentucky* (559 US 356 [2010]). As a matter of fundamental fairness, *Padilla* must be applied retroactively. The majority declines to do so, in large part, because for many

years courts around the country failed to recognize defense attorneys' obligation to inform noncitizen defendants of the deportation consequences of their pleas. That courts previously fell short in protecting the rights of noncitizens, however, hardly justifies refusing to protect their rights now. I therefore dissent.

Since 1917, the deportation of noncitizens convicted of crimes of moral turpitude has been authorized (*id.* at 361). Historically, sentencing judges in both state and federal prosecutions nevertheless retained significant discretion to grant relief from deportation (*id.* at 361-362). Over time, Congress increased the number of deportable offenses and reduced discretionary relief from deportation (*id.* at 363-364). In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA) (Pub L 104-132, 110 US Stat 1214) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) (Pub L 104-208, 110 US Stat 3009), which "dramatically raised the stakes of a noncitizen's criminal conviction" by making deportation a practical certainty for a noncitizen who pleads guilty to any of a broad array of offenses (*id.* at 363-364; *see INS v St. Cyr*, 533 US 289, 292-293 [2001]).

Deportation is an unusually serious consequence of pleading guilty, often more serious than the prison sentence imposed. It can banish defendants from the only home they have known and separate them from family and friends. Indeed, it can result in the loss "of all that makes life worth living" (*Ng Fung Ho v White*, 259 US 276, 284 [1922]). Nevertheless, it long was the view that defense attorneys could provide constitutionally adequate representation without informing their noncitizen clients of the potential deportation consequences of their pleas.

This Court confirmed that view in its unfortunately timed decision in *People v Ford* (86 NY2d 397 [1995]). *Ford*'s analysis was dubious even in 1995 because of the large number of crimes that were then deportable offenses. But the full consequence of its holding was realized just one year later in 1996 when Congress passed AEDPA and IIRIRA. During the ensuing decade and a half, however, the Court never repudiated *Ford*. It was not until the Supreme Court decided *Padilla* that noncitizen defendants in New York were afforded the right to advice about the deportation consequences of their pleas.

In 2013 the Supreme Court decided *Chaidez v United States* (568 US —, 133 S Ct 1103 [2013]) and held that *Padilla* announced a "new rule" under *Teague v Lane* (489 US 288 [1989]) and should not apply retroactively. The majority concurs with

the Supreme Court without grappling with the difficult questions of retroactivity that this case presents under state law.

In 1995, the Court concluded in *People v Eastman* (85 NY2d 265 [1995]) that it was bound to apply *Teague* in determining the retroactivity of federal rules (*id.* at 274-275). The Supreme Court subsequently clarified in *Danforth v Minnesota* (552 US 264 [2008]) that the *Teague* framework was designed for "the unique context of federal habeas and therefore had no bearing on whether States could provide broader relief in their own post conviction proceedings" (*id.* at 277). The Supreme Court identified the most salient features of habeas corpus proceedings as finality of and comity for state convictions (*id.* at 279). It noted that the absence of comity concerns in state post-conviction proceedings "militate[s] in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*" (*id.* at 280). The Supreme Court thus held that the decision to apply a new federal rule retroactively was inherently a question of state law.

This case presents the Court with its first opportunity after *Danforth* to clarify whether it will exercise its independent judgment to account for any unique state values and policies in determining the retroactivity of federal rules. The majority declines to do so, instead applying *Teague* in lockstep with the Supreme Court.

I believe that it is critically important for the Court to engage in a more searching retroactivity analysis, particularly where, as here, significant state concerns are at play. New York is home to 12.5% of all lawful permanent residents in the country, the second largest population of any state (Nancy Rytina, *Estimates of the Legal Permanent Resident Population in 2012*, US Department of Homeland Security, Office of Immigration Statistics, Population Estimates [July 2013], available at http:// www.dhs.gov/sites/default/files/publications/ois_lpr_pe_ 2012.pdf). Foreign-born residents make up 22% of New York's population, nearly twice the national average (United States Census Bureau, State & County QuickFacts: New York, http:// quickfacts.census.gov/qfd/states/36000.html). At over three million people, New York City has more foreign-born immigrants than any other city in the country (*More Foreign-Born Immigrants Live in NYC Than There are People In Chicago*, Huffington Post [Dec. 19, 2013], available at http://www. huffingtonpost.com/2013/12/19/new-york-city-immigrants_

n_4475197.html).* It is also the most linguistically diverse city in the world (Sam Roberts, *Listening to [and Saving] the World's Languages*, The New York Times [Apr. 28, 2010], available at http://www.nytimes.com/2010/04/29/nyregion/29lost.html). New York therefore has an exceptional interest in protecting the rights of noncitizens. In this light, I would hold that *Padilla* established a watershed rule of criminal procedure that falls within the second exception to *Teague*'s bar on retroactive application of new rules.

The majority's understanding of the first "watershed" rule requirement, that a new rule "be necessary to prevent an impermissibly large risk of an inaccurate conviction" (*Whorton v Bockting*, 549 US 406, 418 [2007] [internal quotation marks omitted]) is overly narrow. Accuracy, particularly in the plea context, encompasses more than just convicting the right person, it goes also to the appropriate level of criminality and attendant punitive consequences.

A plea is an admission of guilt, but it is also a surrender of fundamental constitutional protections. Accordingly, the validity of a plea depends not only upon a defendant's actual guilt or innocence, but upon whether the plea was knowing and voluntary (*Boykin v Alabama*, 395 US 238, 242 [1969] [explaining that a plea is a confession of guilt that is admissible only upon a determination of its voluntariness]). A plea taken by a defendant unaware of its most important consequences is not "accurate" in any legal sense. Elevating a new rule's effect on the factual accuracy of a plea over its legal accuracy operates to favor convictions at the expense of individual rights in a manner incongruent with the principles undergirding our Constitution.

The *Padilla* rule goes to the heart of the legal accuracy of a conviction. Deportation is a consequence "so certain, potentially pivotal and prevalent as to make its disclosure essential to assuring that the guilty plea of a noncitizen is knowing, intelligent and voluntary" (*People v Peque*, 22 NY3d 168, 208 [2013, Lippman, Ch. J., dissenting]).

*Padilla* also meets the second requirement for a watershed rule. It implicates fundamental fairness and "alter[ed] our understanding of the bedrock procedural element[ ]" of the

---

* The percentage of those who are naturalized citizens is increasing—a majority of the foreign-born are now naturalized (Department of City Planning, City of New York, *The newest New Yorkers: Characteristics of the City's Foreign-born Population* [2013 ed], available at http://www.nyc.gov/html/dcp/pdf/census/nny2013/nny_2013.pdf).

Sixth Amendment right to counsel by adding a previously unrecognized requirement that is "essential to the fairness of a proceeding" (*Whorton*, 549 US at 418, 420-421).

The majority fails to recognize the profound meaning of *Padilla* by gazing down the wrong end of the telescope, claiming it "imposes a relatively modest duty on counsel" (majority op at 797). This is not the appropriate metric for measuring *Padilla*'s effect on the right to counsel. The measure of *Padilla*'s significance is the extent to which it altered Sixth Amendment law and whether the rule implicates fundamental fairness (*see Whorton*, 549 US at 418). The majority readily concedes that *Padilla* "flatly contradicted and supplanted" prior precedent, broke new ground, and imposed a new obligation (majority op at 799), and cannot deny that noncitizen defendants must be informed of the immigration consequences of their pleas as a matter of fundamental fairness.

The majority ultimately finds refuge in the Supreme Court's assurances that new rules falling within *Teague*'s watershed exception are unlikely to emerge (majority op at 796). However, we are not bound by the Supreme Court's narrow definition of "watershed" rules (*see Danforth*, 552 US at 277-280). Furthermore, defining *Teague*'s watershed exception narrowly, while defining "new rule" broadly, inevitably produces the Kafkaesque result that the more a rule sweeps away prior bad law and implicates fundamental fairness to criminal defendants, the less likely it is that a defendant can seek retroactive relief under the rule.

Additionally, I would find the rule retroactive under *People v Pepper* (53 NY2d 213 [1981]). The majority fails to give *Pepper* its due, particularly in light of *Danforth*'s holding that retroactivity of federal rules is a question of state law. The majority offers no explanation as to why the retroactivity of new federal constitutional protections should be interpreted under *Teague*, rather than under this State's more flexible *Pepper* standard. But even assuming *Teague* applies to federal rules, State law can apply here.

"In the past we have frequently applied the State Constitution . . . to define a broader scope of protection than that accorded by the Federal Constitution in cases concerning individual rights and liberties" (*People v P.J. Video*, 68 NY2d 296, 303 [1986]). The State Constitution ensures criminal defendants a right to counsel more robust than that guaranteed by the US

Constitution (*see People v Bing*, 76 NY2d 331, 338-339 [1990] ["(B)y resting the right (to counsel) upon this State's constitutional provisions guaranteeing the privilege against self-incrimination, the right to assistance of counsel and due process of law we have provided protection to accuseds far more expansive than the Federal counterpart"]). It should be evident that defendant has a right to counsel under the State Constitution at least equivalent to that outlined in *Padilla*. The issue then is whether that right in its *Padilla* extension should under State law be applied retroactively. That inquiry depends upon a balancing of: "(a) the purpose to be served by the new standard[ ], (b) the extent of the reliance by *law enforcement* authorities on the old standard[ ], and (c) the effect on the administration of justice of a retroactive application of the new standard[ ]" (*Pepper*, 53 NY2d at 220 [emphasis added]). The final two factors are to be considered only where the answer to the retroactivity question is not found in the first factor (*id.* at 220).

This Court has stated that, under the first factor, new constitutional rules "that go to the heart of a reliable determination of guilt or innocence" will be applied retroactively, whereas rules that "are only collateral to or relatively far removed from the fact-finding process at trial" will not (*id.* at 221). Our prior focus on the accuracy of the fact-finding process at trial should not restrict us given that we have yet to analyze the retroactivity of a State rule that goes to the heart of the validity of a plea. Just as with the first requirement for a watershed rule under *Teague*, the narrow focus on factual accuracy in determining the retroactivity of a rule governing pleas is inappropriate. The relevant inquiry is whether the new rule is necessary as a matter of fundamental fairness to protect the integrity of plea proceedings and to ensure that a defendant's plea is knowing and voluntary.

The rule that a noncitizen must be informed of the immigration consequences of pleading guilty undeniably is necessary as a matter of fundamental fairness to ensure that a defendant's plea is knowing and voluntary. Its effect is not indirect—the rule goes to the heart of the validity of a conviction by plea.

The answer to the retroactivity question thus is found in the first factor and consideration of the final two factors is unnecessary. But even if the final two *Pepper* factors were necessary to the analysis, they would not warrant a different result. This Court's decision in *Ford* would seem to have induced little reli-

ance by law enforcement authorities. If we expand the scope of the second factor to encompass the defense bar, as does the majority, we also must account for the significant changes in immigration law shortly after we decided *Ford* that undermined our analysis. "For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea" (*Padilla*, 559 US at 372).

Last, the effect on the administration of justice is speculative. Finality should not weigh heavily in this analysis. In *Padilla* cases, counsel's advice will not be on the record, and defendants by necessity can seek relief only in post-conviction CPL 440.10 proceedings. In any event, the majority makes no attempt to quantify the number of defendants who might seek relief under CPL 440.10 were the *Padilla* rule given retroactive effect. And, in reality, the floodgates argument lacks force, as many affected defendants already have been deported (US Department of Homeland Security, Immigration and Customs Enforcement, FY 2013 ICE Immigration Removals, https://www.ice.gov/removal-statistics/ [reporting over 100,000 interior criminal removals in 2013]).

*Padilla* expresses a rule of fundamental fairness. Whether that rule should be given retroactive effect implicates basic questions of humanity and justice. This is not a matter to be treated as a sterile question of legal doctrine.

RIVERA, J. (dissenting). Retroactive application of *Padilla v Kentucky* (559 US 356 [2010]) to collateral review of criminal convictions would ensure the essential fairness of our criminal justice system and the just treatment of defendants, regardless of immigration status. Unlike the majority, I believe that *Padilla* did not announce a new rule of federal constitutional criminal procedure. Instead, as clearly explained by the dissent in *Chaidez v United States* (568 US —, —, 133 S Ct 1103, 1114 [2013, Sotomayor, J., dissenting]), *Padilla* applied the well-established standard of *Strickland v Washington* (466 US 668 [1984]) to determine that a criminal defense lawyer is constitutionally ineffective when that lawyer fails to inform a client of the immigration consequences of a guilty plea. The professional norms in New York State have recognized this defense obligation for decades. Therefore, I conclude that *Padilla* should apply retroactively when a defendant seeks collateral review of a state conviction in state court. I dissent.

As the United States Supreme Court has made clear, state courts are not bound by federal decisions governing the non-

retroactive effect of decisional law in collateral challenges to state criminal convictions (*see Danforth v Minnesota*, 552 US 264, 278-279 [2008]). While the rule of retroactivity announced in *Teague v Lane* (489 US 288 [1989]) promotes uniformity of federal law, it also protects the sovereign interests of the states by encouraging comity among the courts (*see Danforth*, 552 US at 280). However, the concerns of federalism and comity are not implicated when a state court reconsiders a final judgment from its own courts. As the Supreme Court recognized, "[i]f anything, considerations of comity militate in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*" (*id.* at 279-280). Therefore, we are not bound by, and there is no reason for us to adopt, the Supreme Court's retroactivity analysis as set forth in *Chaidez v United States* (568 US —, 133 S Ct 1103 [2013]), which concluded that *Padilla* should not be applied retroactively in a federal collateral review of a criminal conviction.[1]

Turning to the retroactivity question in this appeal, unlike the Chief Judge, I do not conclude that *Padilla* announced a watershed rule (*see* dissenting op at 803) because I do not agree with the majority that *Padilla* created a new rule of federal constitutional procedure (*see* majority op at 799). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government" (*Teague*, 489 US at 301). *Padilla* did neither. It merely recognized what members of the defense and immigration bar in New York State had known for years, that the immigration consequences of a guilty plea are so weighty and of such critical importance to the lives of defendants and their families that a defense lawyer who fails to inform a client of these potential consequences falls far short of professional norms (*see Padilla*, 559 US at 372 ["For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea"]).

New York's criminal defense bar has long regarded providing advice on the immigration consequences of a guilty plea as part of its professional obligation. Even prior to 1996, when Congress enacted new, draconian immigration laws (*see* Antiterrorism

---

1. As my analysis focuses on the application of *Strickland* and the professional norms in New York State, I need not address whether *Danforth* and *Teague* foreclose us from determining, as an initial matter, that a Supreme Court decision does not constitute a new rule.

and Effective Death Penalty Act [AEDPA], Pub L 104-132, 110 US Stat 1214; Illegal Immigration Reform and Immigrant Responsibility Act [IIRIRA], Pub L 104-208, 110 US Stat 3009), New York's lawyers recognized that defense counsel has a burden "to research the relevant law and advise . . . clients about the possible immigration consequences of guilty pleas and criminal convictions" (Edward Bendik & Patricia Cardoso, *Immigration Law Considerations for the Criminal Defense Attorney*, 61 NY St BJ 33, 36 [July 1989]). In the wake of the new federal laws, New York's defense bar increased its efforts to advise lawyers of the immigration consequences of their clients' guilty pleas. According to amici, within months of the passage of AEDPA and IIRIRA, attorneys held training sessions across New York to inform the defense bar of the automatic immigration consequences of seemingly advantageous guilty pleas. In September 1997, the New York State Defenders Association (NYSDA) created the Criminal Defense Immigration Project (CDIP) to help defense attorneys understand the immigration consequences of criminal convictions. The program developed voluminous training material, conducted numerous training sessions, and provided a free immigration consultation hotline to criminal defense lawyers. In 1998, CDIP published a treatise, now in its fifth edition, on the evolving law at the intersection of immigration practice and criminal defense.

Many other organizations joined NYSDA in educating defense lawyers about the immigration consequences of convictions. For example, the Legal Aid Society, New York City's largest provider of criminal defense services, trained its lawyers on the immigration consequences of crimes. It also continued its decades-long practice of providing immigration advice through in-house specialized attorneys who assist Legal Aid's criminal defense attorneys. The New York State Bar Association's standards for defense counsel also reflected the widespread recognition among New York's defense attorneys that effective representation included advising clients of immigration consequences (*see* New York State Bar Association, Special Committee to Ensure Quality of Mandated Representation, *Standards for Providing Mandated Representation* standard I-7 [2005]).[2] The effort of

---

2. "[E]ffective . . . representation . . . means, at a minimum: a. Obtaining all available information concerning the client's background and circumstances for purposes of . . . avoiding, if at all possible, collateral consequences including . . . deportation . . . ; e. Providing the client with full information

New York's defense bar mirrored the prevailing professional norms across the country, which recognized "that counsel must advise [the] client regarding the risk of deportation" (*Padilla*, 559 US at 367). For example, as early as 1995, the National Legal Aid and Defender Association required defense lawyers to inform their clients about the immigration consequences of a plea (*see* National Legal Aid & Defender Association, Performance Guidelines for Criminal Defense Representation, guideline 6.2 [1995], *see* http://www.nlada.org/Defender/Defender_Standards/Performance_Guidelines#sixtwo). Likewise, the American Bar Association's standards recognized the defense lawyer's obligation to advise clients of immigration consequences (*see* American Bar Association, ABA Standards for Criminal Justice, Pleas of Guilty, standard 14-3.2 [f] at 9 [3d ed 1999], available at http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/pleas_guilty.authcheck dam.pdf).

When the members of the bar assume professional obligations and tailor their practice to the realities of their clients' lives, we should consider *Strickland* in light of the norms they have established (*Chaidez*, 568 US at —, 133 S Ct at 1115 [Sotomayor, J., dissenting]). Furthermore, it is simply inaccurate to suggest, as the majority does (majority op at 799-800), that *People v Ford* (86 NY2d 397 [1995]) prevented New York's defense bar from establishing professional norms requiring defense counsel to advise noncitizens of the immigration consequences of guilty pleas. As New York's history of immigrant defense representation establishes, notwithstanding *Ford*, the defense and immigration bars in New York recognized that informing clients of the immigration consequences of a guilty plea was integral to the Sixth Amendment right to effective assistance of counsel. By removing any judicial remedy for a guilty plea made without knowledge of the immigration consequences, *Ford* made the efforts to educate defense lawyers about deportation consequences even more urgent. Thus, *Ford* must be treated as an impetus, not as an obstacle, to the evolution of professional norms regarding representation of noncitizen clients.

The particularized New York experience illustrates that where the Supreme Court "merely appl[ies] *Strickland* in a way that

concerning such matters as . . . immigration . . . consequences under all possible eventualities" (New York State Bar Association, *Standards for Providing Mandated Representation* standard I-7 at 16-17 [2005], available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26702).

corresponds to an evolution in professional norms, [it makes] no new law," (*Chaidez*, 568 US at —, 133 S Ct at 1115 [Sotomayor, J., dissenting]). Yet, the majority concludes that *Padilla* pronounced a new rule of constitutional law (majority op at 799). This is simply not the case. *Padilla* did not lack any basis in existing precedent, and, therefore, it did not announce a new rule. Instead, as Justice Sotomayor makes clear in dissent, *Padilla* employed the familiar two-prong test of *Strickland* (*Chaidez*, 568 US at —, 133 S Ct at 1115-1117 [Sotomayor, J., dissenting]).

It is true that *Padilla* rendered *Ford* invalid, but that is due to *Ford*'s incorrect application of *Strickland*, not its use of an erroneous legal standard. *Ford* relied on federal precedent that held that "the failure to advise a defendant of the possibility of deportation does not constitute ineffective assistance of counsel" (*see Ford*, 86 NY2d at 405, citing *United States v Del Rosario*, 902 F2d 55, 59 [DC Cir 1990], *United States v Campbell*, 778 F2d 764, 768 [11th Cir 1985], and *United States v Gavilan*, 761 F2d 226, 228 [5th Cir 1985]). The *Padilla* opinion established that these cases, like *Ford*, applied *Strickland* incorrectly. Thus, *Ford* should not weigh against applying *Padilla* retroactively in our state courts.

Moreover, *Ford*'s other holding, that deportation is a collateral consequence of a conviction, illustrates the difference between a new rule and the application of established precedent to specific factual scenarios. If the Supreme Court had rejected the binary rule distinguishing between collateral and direct consequences of a guilty plea, which it specifically chose not to do (*Padilla*, 559 US at 365), then the Court would have announced a new rule—one which truly would have upended the analytical foundations of the law (*see Chaidez*, 568 US at —, 133 S Ct at 1110-1111). However, the *Padilla* decision does not reflect this type of seismic shift in the law. That many defendants may benefit from *Padilla* does not mean that *Padilla*'s rule was new in a constitutional sense. It merely means that the error of *Ford*, which *Padilla* corrected, harmed many defendants.

As *Padilla* did not announce a new rule, there is no reason to consider its retroactive application under *Teague*, or for that matter under *People v Pepper* (53 NY2d 213 [1981]). In *Pepper*, we adopted the Supreme Court's then-current retroactivity analysis (*see id.* at 220). However, that approach is outdated, replaced by the Supreme Court's retroactivity rules announced in *Teague* and *Danforth* (*see Danforth*, 552 US at 280). As the

analytic foundation of *Pepper* has been discarded by the Supreme Court, we should also abandon its now discredited approach to retroactivity.

Instead, we must decide whether retroactive application of *Padilla* serves the state's interests in the proper, sound, and fair implementation of our criminal justice system. Just treatment of defendants and the public's confidence in the rule of law should be the primary considerations in a retroactivity analysis. It is these concerns that ensure the integrity of our judicial system and democratic institutions, and they outweigh any costs in lost administrative efficiency.

I agree with the Chief Judge that we must "engage in a more searching retroactivity analysis, particularly where, as here, significant state concerns are at play" (dissenting op at 802). I also agree that, given its significant and diverse immigrant population, New York has unique interests at stake in the retroactive application of *Padilla* (*id.*). I would add that New York has critical interests in the proper and fair administration of our state's criminal justice system, a system characterized by large caseloads and numerous judicial proceedings. In 2013 alone, New York's criminal courts disposed of 588,848 adult arrests (*see* New York State Division of Criminal Justice Services, 2009-2013 Dispositions of Adult Arrests, New York State Adult Arrests Disposed, available at http://www.criminaljustice.ny.gov/crimnet/ojsa/dispos/nys.pdf). A criminal justice system that affects that many lives must be able to assure its constituents that every proceeding is fair, and that all defendants are treated justly, regardless of immigrant status.

There is no binding or persuasive legal argument against retroactive application of *Padilla*, and doing so advances our state interests in fairness and justice. Therefore, I dissent.

Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN dissents in an opinion; Judge RIVERA dissents in a separate opinion; Judge ABDUS-SALAAM taking no part.

Order reversed and order of Supreme Court, Bronx County, reinstated.