[69 NE3d 611, 46 NYS3d 824]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH
BRIDGEFORTH, Appellant.

Argued November 17, 2016; decided December 22, 2016

## POINTS OF COUNSEL

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Tammy E. Linn* of counsel), for appellant.

*Richard A. Brown, District Attorney*, Kew Gardens (*Danielle S. Finn, Merri Turk Lasky, Robert J. Masters, John M. Castellano, Johnnette Traill* and *Joseph N. Ferdenzi* of counsel), for respondent.

*Akin Gump Strauss Hauer & Feld LLP*, New York City (*Alice Hsu, Joseph L. Sorkin, Stan Chiueh* and *Sofie Syed* of counsel), and *Vinay Harpalani, Savannah Law School*, for Fred T. Korematsu Center for Law and Equality and others, amici curiae. ∎

**OPINION OF THE COURT**

ABDUS-SALAAM, J.

This appeal requires us to consider whether skin color of a prospective juror is a cognizable classification upon which a

challenge to a prosecutor's use of peremptory strikes under *Batson v Kentucky* (476 US 79 [1986]) may be based. We recognize the existence of discrimination on the basis of one's skin color, and acknowledge that under this State's Constitution and Civil Rights Law, color is a classification upon which a *Batson* challenge may be lodged. The courts below held that defendant failed to make a prima facie showing of discrimination when he challenged the prosecutor's use of peremptory strikes to exclude dark-colored women. We find this was error, and therefore reverse.

## I.

*Batson* provides the framework under which courts analyze challenges to peremptory strikes of potential jurors based on alleged discrimination. The Supreme Court of the United States held that "the Equal Protection Clause [of the Fourteenth Amendment] forbids [a] prosecutor to challenge potential jurors solely on account of their race" (476 US at 89). *Batson*'s application has been extended to discrimination on the basis of sex (*see J. E. B. v Alabama ex rel. T. B.*, 511 US 127 [1994]) and ethnicity (*see Hernandez v New York*, 500 US 352 [1991]). *Batson* outlines a three-step protocol to be applied when a defendant challenges the use of peremptory strikes during voir dire to exclude potential jurors for pretextual reasons. At step one, the movant must make a prima facie showing that the peremptory strike was used to discriminate; at step two, if that showing is made, the burden shifts to the opposing party to articulate a non-discriminatory reason for striking the juror; and finally, at step three, the trial court must determine, based on the arguments presented by the parties, whether the proffered reason for the peremptory strike was pretextual and whether the movant has shown purposeful discrimination (*see id.* at 96-98).

We have adopted *Batson* under the State Constitution and prohibit discrimination against prospective jurors by either the People or the defense "on the basis of race, gender or any other status that implicates equal protection concerns" (*People v Luciano*, 10 NY3d 499, 502-503 [2008]; *see People v Kern*, 75 NY2d 638 [1990]). In this appeal, we are asked to decide whether skin color is a "status that implicates equal protection concerns" (*id.*).

■ The Equal Protection Clause of the State Constitution provides:

"No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of *race, color*, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state" (NY Const, art I, § 11 [emphasis added]).

The separation of "race" and "color" in the Clause indicates that "color" is a distinct classification from "race." Similarly, section 13 of the Civil Rights Law, which prohibits disqualification of a state citizen from jury service on the basis of certain personal characteristics, lists "race" and "color" as distinct classes. Specifically, this provision states that "[n]o citizen of the state possessing all other qualifications which are or may be required or prescribed by law, shall be disqualified to serve as a grand or petit juror in any court of this state on account of *race*, creed, *color*, national origin or sex" (Civil Rights Law § 13 [emphasis added]). These provisions indicate that "color" is a separate and distinct classification from "race." It follows, then, that color has been recognized as a category upon which discriminatory practices have been based, including exclusion from jury service.

Our State Constitution and Civil Rights Law plainly acknowledge that color is a "status that implicates equal protection concerns" (*Luciano*, 10 NY3d at 503), and therefore a *Batson* challenge may be based on color. Discrimination on the basis of one's skin color—or colorism—has been well researched and analyzed, demonstrating that "not all colors (or tones) are equal" (Trina Jones, *Shades of Brown: The Law of Skin Color*, 49 Duke LJ 1487, 1499 [2000]; *see* Taunya Lovell Banks, *Colorism Among South Asians: Title VII and Skin Tone Discrimination*, 14 Wash U Global Stud L Rev 665, 671-674 [2015]; Michael Hughes & Bradley R. Hertel, *The Significance of Color Remains: A Study of Life Chances, Mate Selection, and Ethnic Consciousness Among Black Americans*, 68 Soc Forces 1105, 1116 [1990]). Persons with similar skin tones are often perceived to be of a certain race and discriminated against as a result, even if they are of a different race or ethnicity. That is why color must be distinguished from race. Today, we acknowledge color as a classification separate from race for *Batson* purposes, as it has already been acknowledged by our State Constitution and Civil Rights Law. Making this distinction is necessary to serve the purpose of *Batson*, which recognized

that discrimination in the selection of jurors violates "a defendant's right to equal protection because it denies him [or her] the protection that a trial by jury is intended to secure" (476 US at 86). Where individuals are excluded from jury service on the basis of their skin color, the defendant is denied the right to a trial by a jury of his or her peers, which is meant to reflect the community in which the defendant lives. As we stated in *People v Kern*, jury service is a principal means of participation in government, and has been used as an instrument of public justice, requiring that " 'the jury be a body truly representative of the community' " (75 NY2d at 652, quoting *Smith v Texas*, 311 US 128, 130 [1940]). " 'For . . . discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government' " (*id.*). We therefore extend the application of *Batson* to challenges based on color to ensure that the jury is not used as a tool to accomplish such discrimination.

Recognizing that a *Batson* challenge may be premised on skin color does not conflict with our holding in *People v Smith* (81 NY2d 875 [1993]). There, we rejected the defendant's contention that a *Batson* challenge may be based on the exclusion of "minorities" in general, regardless of race (*id.* at 876). Using peremptory strikes to exclude "minorities"—a category that includes a vast and varied group of individuals that is subject to change based on census and other demographic data based on population—is quite different from excluding potential jurors because they share a similar skin color. Skin color is generally an immutable characteristic.

When a movant seeks to meet his or her prima facie burden of demonstrating that a peremptory strike was used to discriminate by showing that multiple members of a cognizable group were excluded, the movant may meet the prima facie burden by demonstrating that the perempted potential jurors have a similar skin color, for example, dark-colored as was alleged here.[1] That is a much narrower showing than for an overall classification as a "minority," and does not rest on racial

---

1. Movant's burden would be the same whether the challenge is to one prospective juror of a cognizable group or more than one. As we have recognized, "[t]here are no fixed rules for determining what evidence will . . . establish a prima facie case of discrimination" (*People v Bolling*, 79 NY2d 317, 323-324 [1992]). A "pattern" of discrimination is not always

identity, but on color, which, as stated, is separate and distinct from race under the State Constitution and the Civil Rights Law. Indeed, there is no indication that members of minority groups generally were excluded from the jury in this case, as the record demonstrates that four of the seven seated jurors prior to the *Batson* challenge belonged to minority groups. Rather, defendant's challenge was specific to the People's use of peremptory strikes to exclude dark-skinned women—a color classification.

In cases where the People or a defendant makes a *Batson* challenge on the basis of color, it is for the trial court, using the existing *Batson* protocol, to decide whether the individuals identified as part of that group share a similar skin color, in the same way the trial court makes determinations about race, gender, and ethnicity classifications. It is within this framework that we analyze the *Batson* challenge in the case before us.

## II.

Defendant, a dark-complexioned African-American male, along with several other individuals, was involved in a robbery in Queens. As a result, defendant was charged with one count of robbery in the first degree and two counts of robbery in the second degree. During voir dire, the prosecutor used peremptory challenges to exclude a number of potential jurors. One of those jurors, the subject of this appeal, was a dark-complexioned Indian-American woman. Defense counsel lodged a *Batson* challenge as to five of the prosecutor's peremptory strikes, stating: "The district attorney has now perempted all the female black women and I don't believe that there are valid reasons other than their face and their gender that they have been challenged." Defense counsel specified that she was referring to "[t]he black or dark-colored [women]," noting that "the Guyanese women [were] included in that" group. The People responded "Well, Judge, we are either going to do Guyanese or African American, can't do black or skin color, Judge. But I have reasons for everybody." The trial judge did not make a step one finding. The prosecutor, however, immediately proceeded to supply reasons for four of the excluded potential jurors. When it came to the juror at issue, the prosecutor stated: "I'm trying to remember why I got rid of her," but

required, as *Batson* is applicable where the challenge is directed at a single juror of a cognizable group (*see People v Smocum*, 99 NY2d 418, 421-422 [2003]).

ultimately failed to provide a reason for striking her participation on the jury. Defense counsel again noted her objection, and in response to the trial judge's prompting to give specific reasons for why the People's explanations were pretexts, defense counsel stated that the woman "did not indicate that there was any reason why she would not be fair and impartial." The prosecutor replied that whether the potential juror would be fair and impartial is not the relevant inquiry, but rather whether there was a non-discriminatory reason for perempting the juror. The court agreed with the prosecutor on the requisite inquiry and then proceeded to seat one of the other black female jurors included in the group of black or dark-colored women the prosecutor perempted. The juror at issue here, however, was ultimately not seated.

As an initial matter, we reject defendant's argument that the issue of whether he made out a prima facie case of discrimination at step one of the *Batson* protocol is moot and should not be revisited on appeal because the court moved past that threshold inquiry. In *Hernandez v New York*, the Supreme Court of the United States held that whether the movant on a *Batson* challenge made a prima facie showing of discrimination becomes moot when the opposing party presents a non-discriminatory reason for the use of a peremptory strike "and the trial court has ruled on the ultimate question of intentional discrimination" (500 US 352, 359 [1991]). We have adopted that mootness framework, holding in *People v Payne* that we need not review the prima facie showing made at step one "because the subsequent rulings by the trial courts . . . on the ultimate issue of purposeful discrimination and pretext moot this first-step issue" (88 NY2d 172, 182 [1996]; *see People v Smocum*, 99 NY2d 418, 423 [2003] [holding that "(the) issue became moot when the People stated their reasons and the court ruled on the ultimate issue"]). We recently reiterated this proposition in *People v Hecker*, where we held that "[o]nce a party has placed its [non-discriminatory] reasons on the record . . . the sufficiency of the prima facie showing becomes moot" (15 NY3d 625, 652 [2010] [internal quotation marks omitted], citing *Hernandez*, 500 US at 359, and *Smocum*, 99 NY2d at 423).[2] Here, the prosecutor gave non-pretextual reasons for perempting some potential jurors, but gave no reason for

---

2. Defendant, relying on *Hecker*, argues that once step two of the *Batson* protocol is completed the issue of whether a prima facie case of discrimination was made becomes moot. That is incorrect. In two of the companion

perempting the juror at issue. Because the trial court failed to reach the ultimate issue as to the juror in question, defendant's challenge is not moot.

█ Defendant argues that "contrary to the People's position, dark skin color is a cognizable class and, indeed, must be one unless the established protections of *Batson* are to be eviscerated by allowing challenges based on skin color to serve as a proxy for those based on race." We agree with defendant. By arguing that the prosecutor used five of his peremptory strikes to exclude black or dark-colored women, which encompassed the juror at issue here, defendant made a prima facie showing that the People were allegedly discriminating against dark-colored women, thus satisfying step one of the *Batson* protocol (*see* 476 US at 96-97).

At step two of the *Batson* protocol, the prosecutor was required to provide a non-discriminatory reason for perempting the juror at issue. Defendant contends that the juror should have been seated when the prosecutor could not recall why he struck her. It is clear from the record that the prosecutor failed to provide a reason for why he excluded the juror, stating he could not recall. The prosecutor's failure to give a specified reason for why the juror was perempted fails to satisfy the step two requirement. *Batson*'s burden shifting framework requires the nonmovant, here the People, to come forward with some non-discriminatory reason for striking each juror, which the prosecutor fails to do when she or he provides no reason at all. Consistent with this analysis, when faced with this circumstance, the Appellate Division Departments have held that a failure to recall is insufficient to satisfy step two of *Batson* (*see People v Wilson*, 73 AD3d 606, 607-608 [1st Dept 2010]; *People v Dove*, 172 AD2d 768, 768-769 [2d Dept 1991], *lv denied* 78 NY2d 1075 [1991]; *People v Bozella*, 161 AD2d 775, 775-776 [2d Dept 1990]). Thus, the prosecutor's failure to recall why he struck the juror was insufficient to meet his burden at step two. Despite this failure, the trial court did not seat the juror at issue. We hold that because defense counsel met her prima facie burden by alleging that the prosecutor was excluding

cases in *Hecker*, we stated that the issue became moot because the trial courts proceeded to steps two and three of the *Batson* protocol, demonstrating that we require an ultimate determination by the trial court before the issue becomes moot (*see* 15 NY3d at 652). Additionally, *Hecker* relied upon *Hernandez, Payne* and *Smocum*, all of which require an ultimate determination by the trial court before the issue becomes moot.

dark-colored female prospective jurors, and the prosecutor did not give a non-discriminatory reason for excluding one of those jurors, the trial court committed reversible error by not seating the juror.

## III.

Defendant's additional argument that the evidence presented by the People was insufficient to convict him of first-degree robbery is unpreserved for our review. Because the courts below erred in holding that defendant failed to meet his prima facie burden under *Batson*, defendant must be re-tried, and therefore, we do not reach defendant's remaining argument. Accordingly, the order of the Appellate Division should be reversed, and a new trial ordered.

GARCIA, J. (concurring). I agree with the majority that reversal and a new trial are warranted in this case. I write separately because application of our well-established mootness doctrine precludes us from revisiting whether defendant met his step-one burden of identifying a pattern of discrimination against a cognizable group. It is therefore unnecessary to reach the issue of whether "skin color of a prospective juror is a cognizable classification" for purposes of a *Batson* challenge (majority op at 570).

## I.

The Supreme Court in *Batson* set forth a three-step process for determining whether peremptory strikes are racially discriminatory (*Batson v Kentucky*, 476 US 79, 96-98 [1986]). Step one requires two elements to make a prima facie showing of race discrimination: the moving party must demonstrate (1) that members of a cognizable racial group have been excluded from the jury, and (2) that "facts and other relevant circumstances" support an inference of impermissible discrimination (*People v Childress*, 81 NY2d 263, 266 [1993]).

After the moving party has established a prima facie showing, the burden shifts to the nonmoving party to provide a race-neutral explanation for its challenged peremptory choices (*Batson*, 476 US at 96-97). At step three, the trial court determines whether the defendant has shown purposeful discrimination and consequently, whether or not to seat the challenged juror (*id.* at 98).

Twenty-five years ago, the Supreme Court first applied the mootness doctrine in the *Batson* context by declining to review

"the preliminary issue of whether the defendant had made a prima facie showing" at step one (*Hernandez v New York*, 500 US 352, 359 [1991 plurality]). In *Hernandez*, the prosecutor immediately "defended his use of peremptory strikes without any prompting or inquiry from the trial court" and, "[a]s a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination" (*id.*). The Supreme Court reasoned that, where the nonmoving party "has done everything that would be required of him if the [moving party] had properly made out a prima facie case, whether the [moving party] really did so is no longer relevant" (*id.*, citing *Postal Service Bd. of Governors v Aikens*, 460 US 711, 715 [1983]). That is, once a party "has offered a race-neutral explanation for the peremptory challenges" at step two, step one "becomes moot" (*Hernandez*, 500 US at 359).

This Court has adopted the mootness doctrine as an integral part of our *Batson* jurisprudence. Once a party has proffered a race-neutral reason on the record, the sufficiency of the prima facie showing becomes moot (*see People v Hecker*, 15 NY3d 625, 652 [2010], citing *People v James*, 99 NY2d 264, 270 [2002]; *People v Smocum*, 99 NY2d 418, 422 [2003]; *People v Payne*, 88 NY2d 172, 182 [1996]).

In *People v Payne* and its companion cases involving "reverse *Batson*" challenges, the defendants argued that the trial courts erred at step one in concluding that the prosecution had "shown a prima facie case of discrimination merely by noting that all of the challenged jurors were white" (88 NY2d at 181-182). This Court did not address or resolve whether white prospective jurors constituted a cognizable group or whether the striking of white jurors raised an inference of discrimination because the trial courts' subsequent rulings "on the ultimate issue of purposeful discrimination and pretext moot this first-step issue" (*id.*). Similarly, in *People v Hecker* and its companion case, *People v Black*, we did not review whether the defendants met their prima facie burden because "[o]nce a party has placed its race-neutral reasons on the record," step one "becomes 'moot' " (*People v Hecker*, 15 NY3d 625, 652 [2010] [citations omitted]; *see also id.* at 666-667 [Smith, J., concurring in *People v Black* and dissenting in *People v Hecker*]).

There are sound policy reasons for our strict adherence to the mootness doctrine. We have explained that, "to revisit the adequacy of the step one showing unnecessarily evades the

ultimate question of discrimination" (*Hecker*, 15 NY3d at 652; *Smocum*, 99 NY2d at 422). Moreover, the mootness doctrine effectuates *Batson*'s ultimate purpose "to provide assurance . . . that criminal judgments are not tainted by invidious discrimination" (*Hecker*, 15 NY3d at 652).

Today, in reaching the merits of step one, the majority abandons this well-established policy.

## II.

In this case, defendant raised an initial *Batson* challenge, asserting that "[t]he district attorney has now perempted [sic] all the female black women and I don't believe there are valid reasons other than their face [sic] and their gender that they have been challenged." The prosecutor immediately asked the trial court if he could respond and, upon the court's approval, sought defendant's clarification as to which specific women he was challenging. Defendant specified, "the black or dark-colored, the Guyanese women that are included in that." The prosecutor objected to the group classification stating: "Judge, we are either going to do Guyanese or African American, can't do black or skin color." Ultimately, the purported cognizable group apparently included four African-American women and a fifth female juror—the relevant juror in the instant appeal. It is apparent that the court and the parties all believed this juror was Guyanese when, in fact, her juror questionnaire indicates that she was born in India.

Notably absent from the record is any ruling by the trial court regarding the contours of the "cognizable class" or which particular jurors should be included within it. Rather, as the majority makes clear, the prosecutor moved past step one and plunged forward into step two, without any ruling from the trial court regarding whether the purported group of jurors did (or did not) constitute a cognizable class (*see* majority op at 574).[1]

At step two, the prosecutor began by claiming, "I have reasons for everybody." The People then set forth race-neutral reasons for striking the four African-American women. With regard to the fifth juror—the juror now at issue—the prosecu-

---

1. The court's disordered ruling is perhaps unsurprising, as varied versions of the purported "cognizable class" were asserted by defense counsel. Defendant never clearly or consistently articulated any "cognizable group" for purposes of step one of the *Batson* procedure.

tor had trouble remembering why he struck her. Without specifying a race-neutral reason, the People simply concluded: "I believe the People have reasons" and "I haven't gotten rid of all [the] Guyanese people on this panel or gotten rid of all . . . African Americans on this panel."

Despite "trying to remember why [he] got rid of [the disputed juror]," the prosecutor never provided any race-neutral reason—or indeed *any* reason—for striking her from the panel. It is beyond dispute that a prosecutor may not rebut the defendant's case by "merely . . . denying that he had a discriminatory motive" (*Batson*, 476 US at 98), yet the trial court accepted the People's strikes as to four of the challenged jurors, including the juror now at issue.

Accordingly, the trial court's failure to seat this juror was error and our mootness doctrine precludes us from revisiting step one of the *Batson* protocol.

## III.

In a reformulation of our mootness doctrine, the majority asserts that mootness is inapplicable because the court did not make an "ultimate determination" regarding the juror at issue (majority op at 575-576 n 2). Even if this was a correct application of our mootness doctrine—and it is not[2]—the majority's conclusion is factually wrong. Of course, the trial court's "ultimate determination" regarding the juror at issue was made eminently clear when it *refused to seat her* (majority op at 576).[3] Morever, in making its step three determination, the trial court explicitly stated that it found a discriminatory purpose as to one of the five challenged jurors—an African-American woman who was ultimately seated—and specified

---

**2.** The majority's new "ultimate determination" requirement is unsupported by our existing case law, which makes clear that "[o]nce a party has placed its race-neutral reasons on the record, . . . the sufficiency of the prima facie showing becomes 'moot' " (*Hecker*, 15 NY3d at 652 [citations omitted]; majority op at 575). Instead, the majority's approach now mandates appellate review of a step one holding even though an on-the-record reason for striking the juror has been provided—no matter how inadequate or pretextual that reason may be. Such a result undermines the purpose of the mootness doctrine, which is designed to prevent courts from "evad[ing] the ultimate question of discrimination" (*Hecker*, 15 NY3d at 652).

**3.** The majority claims that the mootness doctrine is inapplicable because "the trial court failed to reach the ultimate issue as to the juror in question" (majority op at 576), yet holds that "the trial court committed reversible error by not seating the juror" (majority op at 577). These irreconcilable rulings go unexplained.

that this seated juror was "[t]he *only one*" the court "really questioned," so defendant's "challenge [was] *denied*" (emphasis added). The majority's conclusion that "the trial court failed to reach the ultimate issue" is both inaccurate and irrevelant (*see* majority op at 576).

## IV.

Having disregarded our mootness doctrine, the majority dramatically expands our *Batson* jurisprudence beyond what any court has done before (*see e.g. People v Davis*, 46 Cal 4th 539, 583, 208 P3d 78, 116 [2009] [rejecting "(a)t the outset" defendant's claim that "people of color" can be a cognizable group]; *Gray v Brady*, 592 F3d 296, 302 [1st Cir 2010] [holding that "minorities" cannot constitute a cognizable group under *Batson*]). Indeed, only the Second Circuit has recognized that distinct racial and ethnic groups may be combined for *Batson* purposes, but notably, that court did not rule that "dark skinned" could be its own cognizable group (*see Green v Travis*, 414 F3d 288, 297 [2d Cir 2005]). In *People v Smith*, this Court "reject[ed] appellant's argument that, regardless of race, 'minorities' in general constitute a cognizable racial group" (81 NY2d 875, 876 [1993]).

The majority chooses this case—a case with a garbled record at a moot stage of the proceeding—to hold that "skin color" is a cognizable class for purposes of *Batson*. Such a monumental ruling should occur only after careful consideration, and on a record that properly presents the issue and contains a step one ruling for our review. Instead, the majority announces its holding without the benefit of a call for amicus briefing and without any discussion of the wide-ranging ramifications of its decision in the *Batson* context and beyond. Moreover, the only "guidance" offered to trial courts is that they should somehow "decide whether the individuals identified . . . share a similar skin color" (majority op at 574). The majority's vague assurance that these determinations can be made "in the same way" they are made "about race, gender, and ethnicity classifications" supplies little concrete or practical instruction for lower courts tasked with creating a record that allows for meaningful appellate review (majority op at 574).

In this case, the People failed to provide a race-neutral reason for striking the juror at issue and, accordingly, the trial court erred by failing to seat her. Our analysis should begin and end at that.

Chief Judge DiFiore and Judges Pigott, Rivera, Stein and Fahey concur; Judge Garcia concurs in result in a separate concurring opinion.

Order reversed and a new trial ordered.